UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

DAVID PAUL HAMMER, )
)
                              Plaintiff, )
vs. ) IP 01-558-C-T/G
)
JOHN ASHCROFT, Attorney General of the )
 United States, et al., )
)
                            Defendants. )

**Entry Discussing Motion for Summary Judgment**

      This cause is before the court on the amended complaint of plaintiff David Paul Hammer, on the defendants' answer, and on the defendants' motion for summary judgment.

      Whereupon the court, having considered the pleadings, the motion for summary judgment, the response thereto and the defendants' reply, and being duly advised, now finds that the motion for summary judgment must be **granted.** This conclusion rests on the following facts and circumstances:

      1.     As used in this Entry, "Hammer" refers to the plaintiff, David Paul Hammer, "USPTH" refers to the United States Penitentiary at Terre Haute, Indiana, "BOP" refers to the Federal Bureau of Prisons, "Attorney General Ashcroft" refers to former United States Attorney General John Ashcroft, "Director Lappin" or "Warden Lappin" refers to BOP Director Harley Lappin, "Director Sawyer-Hawk" refers to former BOP Director Kathleen Sawyer-Hawk, and "Warden Olson" refers to USPTH Warden Keith Olson.

      2.     As noted, the defendants seek resolution of Hammer's claims through the entry of summary judgment.

      a.     The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of **FED.R.CIV.P.** 56(e) (quoted in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" In a motion for summary judgment, the court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003)(citations omitted). "Rather, '[t]he court has one

task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.'" *Id.* (quoting *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994)). If a reasonable jury could return a verdict in favor the nonmovant, summary judgment should not be granted. *Id.* (citation omitted).

b.	A court will grant summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Scott v. Edinburg,* 346 F.3d 752, 755 (7th Cir. 2003) (quoting **FED.R.CIV.P.** 56(c) and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). The court must "construe all facts in a light most favorable to . . . the party opposing summary judgment, and . . . draw all reasonable inferences in his favor." *McGreal v. Ostrov,* 368 F.3d 657, 672 (7th Cir. 2004) (citation omitted). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook,* 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith v. Severn,* 129 F.3d 419, 425 (7th Cir. 1997)). However, the nonmoving party bears the burden of coming forward with specific facts from the record which show a genuine issue of material fact. *Morfin v. City of E. Chi.,* 349 F.3d 989, 997 (7th Cir. 2003) (citation omitted). "It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Liberles v. County of Cook,* 709 F.3d 1122, 1126 (7th Cir. 1983).

3.	"Relief from misconduct by federal agents may be obtained either by a suit against the agent for a constitutional tort under the theory set forth in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971), or by a suit against the United States under the Federal Tort Claims Act [FTCA] . . . which permits claims based upon misconduct which is tortious under state law. 28 U.S.C. §§ 1346(6), 2680." *Sisk v. United States,* 756 F.2d 497, 500 n.4 (7th Cir. 1985). Hammer has chosen the *Bivens* route.

a.	Claims asserted under a *Bivens* theory are brought pursuant to subject matter jurisdiction conferred by 28 U.S.C. § 1331, which provides that "[t]he District Courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

b.	A prerequisite to maintaining an action under §1331 is that the plaintiff "must allege a violation of the United States Constitution or a federal statute." *Goulding v. Feinglass,* 811 F.2d 1099, 1102 (7th Cir. 1987), *cert. denied*, 107 S. Ct. 3215 (1987).

c.	*Bivens* "authorizes the filing of constitutional tort suits against federal officers in much the same way that 42 U.S.C. § 1983 authorizes such suits against state officers." *King v. Federal Bureau of Prisons,* 415 F.3d 634, 636 (7th Cir. 2005). Thus, one feature of a *Bivens* action is that the plaintiff must allege that the individual defendants were personally involved in the violation of his constitutional rights. *See Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir. 1987), *cert. denied sub nom. Barbera v. Schlessinger,* 489 U.S. 1065 (1989).

2

4.  Hammer's claims which survive prior rulings and certain voluntary dismissals are that the defendants violated his First Amendment rights by denying and restricting his access to the news media based on the content of his message and his status as a federal death-row inmate. He alleges that between March 2000 and April 2001 a number of news organizations wished to conduct face-to-face or video-conference interviews with him, but that Warden Lappin denied every one of his requests to participate in the interviews. In addition, Hammer alleges that Warden Lappin unconstitutionally restricted Hammer's ability to communicate with the media via telephone or mail correspondence. Hammer seeks compensatory and punitive damages and injunctive relief.

5.  Several general principles guide the court's consideration of the free speech and association claims presented. Among these principles are those on which the Court of Appeals relied in finding that the dismissal of the present action pursuant to 28 U.S.C. § 1915A(b) was premature. *Hammer v. Ashcroft,* 2002 WL 1732580 (7th Cir. 2002) (unpublished).

   a.  Lawful "incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (*citing Price v. Johnston,* 334 U.S. 266, 285 (1948)).

   b.  Nonetheless, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545 (1979).

   c.  Inmates retain First Amendment rights that are consistent with incarceration, and prison restrictions limiting or interfering with those rights must reasonably relate to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89 (1987); *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999).

   d.  While inmates' free-speech rights include access to the media, inmates do not have a right to face-to-face interviews so long as other avenues of communication are open to them, and regulations denying face-to-face interviews are applied in a neutral, equal manner without regard to content. *See Pell v. Procunier,* 417 U.S. 817, 827-28 (1974); *Rowe,* 196 F.3d at 782; *Abu-Jamal v. Price,* 154 F.3d 128, 134 (3d Cir. 1998). Prison officials are given deference in establishing regulations and in determining appropriate restrictions, and a court will not second-guess regulations or practices that serve legitimate penological interests. *Turner,* 482 U.S. at 89. Additionally, as an incident of their incarceration, prisoners lack the same freedom to criticize they would enjoy on the outside. *Gibbs v. King,* 779 F.2d 1040 (5th Cir.), *cert. denied,* 476 U.S. 1117 (1986).

   e.  The Supreme Court has delineated four factors for determining whether a specific regulation or practice serves a legitimate penological interest. *Turner,* 482 U.S. at 89-90. The primary factor is whether a valid, rational connection exists between the restriction and a legitimate interest. *Id.* A restriction on speech that fails to meet this connection fails under *Turner. See Shaw v. Murphy,* 532 U.S. 223, 229-30 (2001).

3

The other factors relevant in determining a restriction's reasonableness include whether the inmate has alternative means of exercising the right; the impact accommodation of the asserted right would have on guards, other inmates, and prison resources; and the absence of a reasonable alternative to the regulation or practice. *Turner,* 482 U.S. at 90.

f.   In determining whether a prison regulation is "'reasonably related to legitimate penological interests,'" a prisoner "must overcome the presumption that the prison officials acted within their 'broad discretion.'" *Shaw v. Murphy,* 532 U.S. 223 (2001). "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 532 U.S. 126, 132 (2003).

6.   As to each of the various specifications of improper action, whether it be the promulgation or implementation of BOP policies or actions assertedly taken outside the bounds of such policies, Attorney General Ashcroft and Director Hawk-Sawyer were not personally involved. The consequence of this is that these defendants are not liable to Hammer for any of those actions and they are entitled to the entry of summary judgment as to the claims against them.

7.   Warden Lappin was Warden of the USPTH from October 25, 1998, until July of 2001. As Warden, Lappin had overall responsibility of all functions of the institution and in that role he planned, directed and coordinated institution programs covering a broad range of diverse issues related to complex institution safety and security requirements. Warden Olson was Warden of the USPTH from August 26, 2001, until September 30, 2004.

8.   On July 13, 1999, the Special Confinement Unit ("SCU") was activated at the USPTH. The SCU is the assigned housing unit for male prisoners under federal sentences of death. While at the USPTH, Hammer has been assigned to the SCU.

9.   The BOP promulgates Program Statements that contain the internal operating policies and procedures of the Bureau in order to provide direction to Bureau personnel in the operation of the federal prison systems. Following the activation of the SCU, numerous institution supplements were reviewed to ascertain if modifications were needed to specifically address the special and unique needs of the SCU. An institution supplement is a statement of procedure which is required in order to given direction to operations of a BOP facility because of local conditions. Institution supplements are reviewed by institution staff and signed by the Warden. Because the USPTH is the only federal facility with such a unit, these policies are specific to the USPTH. Management of the SCU at the USPTH requires consideration of factors not present, or not present to the same degree, in other housing units of the USPTH or other units of other prisons operated by the BOP. The SCU is unique, as is its inmate population. In considering the supplement to Program Statement 1480.05, prison personnel (including Warden Lappin) intended to balance the interests of the inmate and the journalist along with the interests of the BOP with respect to its responsibility of maintaining security and good order at the institution. Additionally, it was the intent of those involved with implementing the Supplement to safeguard the safety and the rights (including privacy rights) of institution staff and of the inmate population. These

were legitimate concerns in the specific environment which was being administered. There was the potential for inmates to be perceived as "jail celebrities," which could disrupt the orderly operation of the prison by undermining prison security. Additionally, the right of privacy of other inmates was a consideration. In a correctional setting, slights, insults or provocations, real or imagined, can result in inmate-on-inmate violence and thus can have dire consequences for inmates, penitentiary staff, and the public at large. The result of this effort was the adoption of Institution Supplement THA 1480.05A.[1]

The procedures implemented as the result of these concerns were determined to be the least restrictive method of protecting the various interests involved–the interest of the individual inmate, the interests of the inmate as a whole, and the interests of the public as a whole. Although Institution Supplement THA 1480.05A restricts Hammer's access to face-to-face interviews with members of the media, it does so in a manner fully in accord with the standard established in *Turner.* That is, the restriction contained in Institution Supplement THA 1480.05A is reasonably related to legitimate penological interests. Hammer has not shown otherwise, even though it is his burden to do so, *Overton v. Bazzetta*, 532 U.S. 126, 132 (2003), and the evidentiary record shows in every respect that the regulation adopted by Warden Lappin via Institution Supplement THA 1480.05A withstands Hammer's constitutional challenge. Not only is the restriction reasonably related to legitimate penological interests, but the restriction is applied in a neutral manner without regard to content. The restriction is applied equally among inmates housed in the SCU. Hammer and other inmates assigned to the SCU may contact media representatives through general and special mail, as well as through monitored and unmonitored telephone calls, giving these inmates an alternative means of exercising the right. Accommodating the unfettered right Hammer asserts would have a disruptive impact on the operation of the prison. Institution Supplement THA 1480.05A sets forth restrictions on inmate content with the media only in areas reasonably deemed proper for the purpose of operating the prison. Although Warden Lappin denied several requests by media representatives for personal interviews with Hammer, Hammer and other inmates assigned to the SCU have meaningful access to the media, and Institution Supplement THA 1480.05A does not infringe on the constitutional guarantee of that access. *See Johnson v. Stephan*, 6 F.3d 691, 692 (10th Cir. 1993) (prisoner's First Amendment rights not violated when prison officials denied face-to-face interview with prisoner since alternative means of communication were available); *Mitford v. Pickett*, 363 F.Supp. 975, 978 (E.D.Ill. 1973) (prison regulations limiting personal interviews of inmates by the press is an internal affair of prison and does not violate the First Amendment where inmates and the press have ample opportunity to communicate by mail). The fact that Hammer does not assess his own history of communication with the media as anything other than benign is not significant, *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990) ("[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit"), just as the fact that the restrictions imposed in Institution Supplement THA 1480.05A were not always in place is not significant, for inmates acquire no interest in unchanging conditions

---

[1] Institution Supplement THA 1480.05A was replaced with Institution Supplement THA 1480.05B in January 2003. For the purpose of the present record, no substantive changes were made to the section addressing media interviews for SCU inmates.

5

of their confinement. *Meachum v. Fano,* 427 U.S. 215, 225 (1976) (transfer of inmates to prison with more burdensome conditions of confinement not a violation of due process). The Supreme Court has stated that content-based speech restrictions are "neutral" so long as distinctions are drawn "solely on the basis of their potential implications for prison security." *Thornburgh v. Abbott,* 490 U.S. 401, 415-16 (1989). Thus, while the government here is proscribing the content of the speech of SCU inmates, this is "neutral" for purposes of this analysis. See also *Giano v. Senkowski,* 54 F.3d 1050, 1055 (2d Cir. 1995) (discussing neutrality under *Turner* ).

10.     Warden Olson was not involved in the drafting or implementation of Institution Supplement 1480.05A in any respect. He did approve the replacement document in January 2003, this being Institution Supplement THA 1480.05B. As noted, however, no substantive changes were made to the section addressing media interviews for SCU inmates.

11.     Hammer's case is built around the view that he is entitled to participate in interviews without regard to the management and control of the SCU. This ignores the realities of the SCU, the reason for its existence, and the legitimate–even the paramount–interests of prison authorities in carrying out the difficult task of operating the SCU.[2] This task warrants deference from the courts, which must be sensitive to their expert judgment and mindful that the judiciary is "'ill equipped' to deal with the difficult and delicate problems of prison management." *Thornburgh v. Abbott,* 490 U.S. 401, 407-08 (1989). At the same time, that deference "must be schooled, not absolute." *Campbell v. Miller,* 787 F.2d 217, 227 n.17 (7th Cir.), *cert. denied,* 479 U.S. 1019 (1986). The fact that initial responsibility for the prison is vested in prison administrators "does not mean that constitutional rights are not to be scrupulously observed." *Bell,* 441 U.S. at 562. For the reasons explained above, prison authorities–including the defendants–have not overstepped the constitutional limits, and the regulation they have crafted is not, as Hammer characterizes it, a simple limit on speech they would find offensive. In the specific environment in which Hammer finds himself, the regulation is a compelling adjunct to the sound management of the SCU–amply passing the constitutional challenge pressed in this case. See, e.g., *Hewitt v. Helms*, 459 U.S. 460, 473 (1983) ("[t]he safety of the institution's guards and inmates is perhaps the fundamental responsibility of the prison administration"); *Pell v. Procunier,* 417 U.S. 817, 823 (1974) (security is "central to all other corrections goals").

12.     Claims such as those presented in this case must be considered in light of the special environment of a prison, where administrators "must be accorded wide-ranging deference in the . . . execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Pardo v. Hosier*, 946 F.2d 1278, 1280-81 (7th Cir. 1991) (internal quotations omitted). Nonetheless, "[f]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Babcock v. White,* 102 F.3d 267, 275 (7th Cir. 1996) (quoting *Turner v. Safley,* 482 U.S.

---

[2] As Hammer himself concedes, he is on death row for having murdered a fellow inmate at a federal prison in Pennsylvania.

78, 84 (1987)). Hammer has not identified a genuine issue of material fact as to his claims against the defendants. Their motion for summary judgment is therefore **granted**.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 2/23/2006

John Daniel Tinder, Judge
United States District Court